# EXHIBIT D

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )      CDC Number B-82089
                           )
GEORGE RUIZ                )
                           )
_____)

PELICAN BAY STATE PRISON

CRESCENT CITY, CALIFORNIA

MAY 9, 2006

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Mr. Robert Harmon, Deputy Commissioner
Mr. Joe Muga, Deputy Commissioner

OTHERS PRESENT:

Mr. George Ruiz, Inmate
Mr. Jim Fallman, Attorney for Inmate
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

**Stacy Wegner, Peters Shorthand Reporting**

ii

INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 12 |
| Post-Commitment Factors | 18 |
| Parole Plans | 15 |
| Closing Statements | 41 |
| Recess | 45 |
| Decision | 46 |
| Adjournment | 51 |
| Transcriber Certification | 52 |

--oOo--

1

## P R O C E E D I N G S

2      **PRESIDING COMMISSIONER FISHER:**  All right.

3  Okay.  This is going to be a subsequent parole

4  consideration hearing for George Ruiz, CDC

5  number B-82089.  Today's date is 5/9/06.  We're

6  located at Pelican Bay State Prison.  The inmate

7  was received on 6/10/81 from San Diego County.

8  The life term began on 6/10/81, and the minimum

9  eligible parole date is 6/3/93.  The controlling

10  offense for which the inmate has been committed

11  is kidnap for robbery, case number CR52779,

12  count one, Penal Code Section 209.  There was

13  also a count two.  That was for Penal Code

14  Section 211, robbery, with the finding of the

15  use of a firearm, Penal Code Section 12022.5.

16  The inmate received a term of 15 years to life.

17  Eight of them is for the robbery for count two

18  up front, and for the kidnap for robbery, it was

19  seven to life.  The minimum eligible parole

20  date, once again, is 6/3/93.  And we are going

21  to tape record today.

22      **INMATE RUIZ:**  Yes.

23      **PRESIDING COMMISSIONER FISHER:**  So for the

24  transcriber, we're each going to say our first

25  and last name and spell our last name.

26      **INMATE RUIZ:**  Okay.

27      **PRESIDING COMMISSIONER FISHER:**  When I get

2

1    to you, would you please also give me your CDC

2    number?

3         **INMATE RUIZ:**  Yes.

4         **PRESIDING COMMISSIONER FISHER:**  Thank you.

5    I'm going to start with myself and go to my

6    right, Susan Fisher, F-I-S-H-E-R, Commissioner.

7         **DEPUTY COMMISSIONER HARMON:**  Robert Harmon,

8    H-A-R-M-O-N, Deputy Commissioner.

9         **DEPUTY COMMISSIONER MUGA:**  Joe Muga, Deputy

10   Commissioner last name is M-U-G-A.

11        **ATTORNEY FALLMAN:**  Jim Fallman, attorney,

12   F-A-L-L-M-A-N.

13        **PRESIDING COMMISSIONER FISHER:**  Go ahead,

14   sir.

15        **INMATE RUIZ:**  George Ruiz, R-U-I-Z, B

16   number, B-82089.

17        **PRESIDING COMMISSIONER FISHER:**  Thank you.

18   I would also note for the record that we have

19   two correctional officers who are here for

20   security purposes and will not be participating

21   in the hearing.  Let's see here.  Where did I

22   put this thing?  It's right in front of me.  All

23   right.  Mr. Ruiz, I'm going to read the

24   American's with Disabilities Act to you.

25        **INMATE RUIZ:**  Yes.

26        **PRESIDING COMMISSIONER FISHER:**  Okay.  Then

27   I just have to ask you a few questions before we

3

```
 1  can move forward.

 2                 The American's with Disabilities

 3                 Act is a law to help people with

 4                 disabilities.  Disabilities are

 5                 problems that make it harder for

 6                 some people to see, hear, breathe,

 7                 talk, walk, learn, think, work, or

 8                 take care of themselves then it is

 9                 for others.  Nobody can be kept out

10                 of public places or activities

11                 because of a disability.  If you

12                 have a disability, you have the

13                 right to ask for help to get to

14                 your Board hearing, get ready for

15                 the hearing, talk, read forms and

16                 papers, and understand the hearing

17                 process.  The Board will look at

18                 what you ask for to make sure that

19                 you have a disability that is

20                 covered by the ADA and that you

21                 have asked for the right kind of

22                 help.  If you do not get help, or

23                 you don't think you got the kind of

24                 help you need, ask for a 1074

25                 grievance form.  You can also get

26                 help to fill it out.

27         Do you understand that?
```

4

1        INMATE RUIZ:  Yes.

2        PRESIDING COMMISSIONER FISHER:  Okay.  Now,

3   on December 9 of '05 you signed the 1073 form

4   and said that you have no disabilities.

5        INMATE RUIZ:  Yes.

6        PRESIDING COMMISSIONER FISHER:  Is that

7   still correct?

8        INMATE RUIZ:  Yes, still.

9        PRESIDING COMMISSIONER FISHER:  Are those

10  reading glasses?

11        INMATE RUIZ:  Yes.

12        PRESIDING COMMISSIONER FISHER:  Okay.

13  Those are considered --

14        INMATE RUIZ:  Well, no.

15        PRESIDING COMMISSIONER FISHER:  No?

16        INMATE RUIZ:  Just every day use.

17        PRESIDING COMMISSIONER FISHER:  For

18  everything?

19        INMATE RUIZ:  Yeah.

20        PRESIDING COMMISSIONER FISHER:  So you do

21  use them when you read?

22        INMATE RUIZ:  Yes.

23        PRESIDING COMMISSIONER FISHER:  Okay.  Did

24  you do an Olson review on your file?

25        INMATE RUIZ:  No.

26        PRESIDING COMMISSIONER FISHER:  Okay.  Do

27  you have any hearing problems at all?

5

1        **INMATE RUIZ:**  No, none.

2        **PRESIDING COMMISSIONER FISHER:**  And have

3   you ever included in the CCCMS or EOP programs?

4        **INMATE RUIZ:**  No.

5        **PRESIDING COMMISSIONER FISHER:**  Okay.  No

6   physical disabilities?

7        **INMATE RUIZ:**  Diabetic.

8        **PRESIDING COMMISSIONER FISHER:**  Okay.

9        **INMATE RUIZ:**  Hepatitis C.

10       **PRESIDING COMMISSIONER FISHER:**  Okay.  And

11  are you on meds for --

12       **INMATE RUIZ:**  Yeah, I'm on meds for --

13       **PRESIDING COMMISSIONER FISHER:**  -- various

14  things?

15       **INMATE RUIZ:**  Yes.

16       **PRESIDING COMMISSIONER FISHER:**  And have

17  you had everything that you should have this

18  morning?

19       **INMATE RUIZ:**  Yeah.

20       **PRESIDING COMMISSIONER FISHER:**  Okay.  So

21  you won't need to take a break or anything --

22       **INMATE RUIZ:**  No.

23       **PRESIDING COMMISSIONER FISHER:**  -- to take

24  medication?  All right, sir.  Okay.  We'll go

25  ahead then.  This hearing is being conducted

26  pursuant to Penal Code Sections 3041 and 3042

27  and the rules and regulations of the Board of

6

1    Parole Hearings that govern parole consideration

2    hearings for life inmates.  And as you know, the

3    purpose of the hearing is to consider your

4    commitment offense --

5         INMATE RUIZ:  Yes.

6         PRESIDING COMMISSIONER FISHER:   -- your

7    prior criminal and social history, and your

8    behavior and programming since you've been in

9    prison for this offense.  We've had the

10   opportunity to review your files there.  I'm

11   going to give you and Mr. Fallman the make any

12   corrections that you need.  All right?

13        INMATE RUIZ:  Okay.

14        PRESIDING COMMISSIONER FISHER:  And we're

15   going to reach a decision today as to whether or

16   not we find you suitable for parole.  And if we

17   do find you suitable, I'll explain to you what

18   the length of your confinement will be.  Before

19   we recess to deliberate today I'm going to give

20   you and Mr. Fallman an opportunity to make a

21   final statement about your suitability.  I want

22   to remind you that you're not required to admit

23   or discuss the offense today but that the Panel

24   accept it is findings of the Court to be true.

25        INMATE RUIZ:  Yes.

26        PRESIDING COMMISSIONER FISHER:  Do you

27   understand that?

7

1     **INMATE RUIZ:** Yes.

2     **PRESIDING COMMISSIONER FISHER:** Okay. The

3     California Code of Regulations states that

4     regardless of time served, a life inmate shall

5     be found unsuitable for and denied parole, if in

6     the judgment of the Panel he would pose an

7     unreasonable risk of danger to society or a

8     threat to public safety if released from prison.

9     You have rights that are related to this hearing

10    that include the right to a timely notice of the

11    hearing, the right to review your Central File,

12    and the right to present relevant documents.

13    Counsel, have those rights been met?

14    **ATTORNEY FALLMAN:** Yes, ma'am.

15    **PRESIDING COMMISSIONER FISHER:** Okay. You

16    also have the right, Mr. Ruiz, to an impartial

17    Panel. Having seen your Panel members today, do

18    you have any objections to the Panel?

19    **INMATE RUIZ:** No.

20    **PRESIDING COMMISSIONER FISHER:** Okay.

21    Counsel?

22    **ATTORNEY FALLMAN:** No.

23    **PRESIDING COMMISSIONER FISHER:** Okay. I'm

24    going to give you a written copy of your

25    decision today. It's going to be tentative, and

26    it will be in effect within 120 days. And then

27    a copy of the decision and a copy of the

8

1  transcript of the hearing today is going to be

2  sent to you.

3      **INMATE RUIZ:**  Okay.

4      **PRESIDING COMMISSIONER FISHER:**  Are you

5  familiar with the process for appealing Board

6  decisions?

7      **INMATE RUIZ:**  Yes.

8      **PRESIDING COMMISSIONER FISHER:**  Okay.  If

9  you need more information about it, your

10  correctional counselor would have it, and it

11  would also be in the prison library.

12      **INMATE RUIZ:**  Yes.

13      **PRESIDING COMMISSIONER FISHER:**  All right.

14  Mr. Fallman, you have everything on the

15  checklist.  Is that correct?

16      **ATTORNEY FALLMAN:**  Yes, I do all right.  Is

17  there anything that needs to be submitted other

18  than what I have here?

19      **ATTORNEY FALLMAN:**  No, other than the

20  multiple page document that I was given today by

21  my client.

22      **PRESIDING COMMISSIONER FISHER:**  Okay.  Any

23  preliminary objections?

24      **ATTORNEY FALLMAN:**  None.

25      **PRESIDING COMMISSIONER FISHER:**  Okay.  And

26  is Mr. Ruiz going to be speaking with us?

27      **ATTORNEY FALLMAN:**  He will.

9

1      PRESIDING COMMISSIONER FISHER:  All right.

2  If you'd raise your right hand, sir, I'm going

3  to swear you in.  Do you solemnly swear or

4  affirm that the testimony you are about to give

5  at this hearing will be the truth, the whole

6  truth, and nothing but the truth?

7      INMATE RUIZ:  I do.

8      PRESIDING COMMISSIONER FISHER:  All right.

9  Thank you.  All right.  What I'm going to do,

10  Counsel, is incorporate by reference the summary

11  of the crime from the '03 transcript.

12      ATTORNEY FALLMAN:  Okay.  I have no

13  objections.

14      PRESIDING COMMISSIONER FISHER:  If you have

15  no objections.

16.      ATTORNEY FALLMAN:  No, none.

17      PRESIDING COMMISSIONER FISHER:  Mr. Ruiz, I

18  know you talked about this in the past, and they

19  read the entire summary of the crime into the

20  record.  I just want to give you an opportunity,

21  if you would, to just kind of give us kind of a

22  thumbnail sketch in your own words on how this

23  came about and what was going on.

24      INMATE RUIZ:  Now?

25      PRESIDING COMMISSIONER FISHER:  Yeah, go

26  ahead.

27      INMATE RUIZ:  That evening -- it's been a

10

1   long time ago.  I might miss some things.

2       PRESIDING COMMISSIONER FISHER:  That's

3   okay.  I just need to get a general idea of what

4   was going on with your involvement.

5       INMATE RUIZ:  I was waiting around.  I was

6   pretty upset.  I needed money for rent and for

7   my methadone that I was on.  And I seen this

8   place and it looked pretty quiet, be no trouble,

9   so I went in there and robbed it.

10      PRESIDING COMMISSIONER FISHER:  Okay.  This

11  was the Village Liquor Store, right?

12      INMATE RUIZ:  Yes.

13      PRESIDING COMMISSIONER FISHER:  Okay.  And

14  how did Mr. Peckam (phonetic) get in the middle

15  of all in?

16      INMATE RUIZ:  Well, I seen him come out of

17  the store and he went in his car, and he put

18  something in the car.  I don't know what it was.

19  And I seen him talking with those people in

20  there, so -- and when I talked to him he said

21  they were his friends, so I just took him back

22  in the store.

23      PRESIDING COMMISSIONER FISHER:  Okay.  So

24  you figured, what, that it would be easier to

25  get them to do what you wanted if you had him?

26      INMATE RUIZ:  Yes.

27      PRESIDING COMMISSIONER FISHER:  Okay.  Is

11

1   there anything -- well, let me tell you what

2   I've got here.  The phone started to ring, and

3   that was when you left, right?  When the phone

4   started to ring you took off?

5       INMATE RUIZ:  Yes.

6       PRESIDING COMMISSIONER FISHER:  Okay.

7   Okay.  And you had your car parked down the

8   street.  Is that right?

9       INMATE RUIZ:  Yes.

10      PRESIDING COMMISSIONER FISHER:  Okay.  So

11  aside from the cigarettes, did you get any

12  money?

13      INMATE RUIZ:  Yes.

14      PRESIDING COMMISSIONER FISHER:  How much?

15      INMATE RUIZ:  I forget how much it was.

16      PRESIDING COMMISSIONER FISHER:  All right.

17  And then ultimately, how did you get arrested?

18  Was it because he saw your car?

19      INMATE RUIZ:  I don't know how I got

20  arrested.  They just had lineup or something, I

21  think, and they said I fit the description.

22      PRESIDING COMMISSIONER FISHER:  Okay.

23      INMATE RUIZ:  I was on a parole violation

24  when they came to see me in the county jail.

25      PRESIDING COMMISSIONER FISHER:  All right.

26  Okay.  All right.  Is there anything about the

27  crime and how it happened or any of the details

12

1  around it that you feel hasn't been discussed

2  before that you think would be important for us

3  to know, or has it been covered pretty well, do

4  you think?

5      **INMATE RUIZ:**  I think it's been covered

6  pretty good.

7      **PRESIDING COMMISSIONER FISHER:**  Okay.  I'm

8  not going to go into a lot of detail about your

9  prior history because that's been done before,

10  so I just want to touch on a couple of things

11  here.  I noticed that a lot of the -- a lot of

12  your arrests and convictions had to do with

13  substances?

14      **INMATE RUIZ:**  Yes.

15      **PRESIDING COMMISSIONER FISHER:**  And were

16  you -- you were a heroin addict.  Is that right?

17      **INMATE RUIZ:**  Yes.

18      **PRESIDING COMMISSIONER FISHER:**  Okay.

19  Let's see here.  Thrown into that were some

20  things like burglary and robbery and

21  shoplifting.  Let's see.  And I'm wondering if

22  most of those were related to your addiction?

23      **INMATE RUIZ:**  Yes, they were.

24      **PRESIDING COMMISSIONER FISHER:**  That was to

25  get money to buy drugs and stuff?

26      **INMATE RUIZ:**  Yeah.

27      **PRESIDING COMMISSIONER FISHER:**  Okay.

13

1   That's what I assumed, and I don't need to go

2   into a lot of detail about it.  But it says in

3   your file here that you started -- you started

4   using heroin -- actually, that you were

5   dependent on heroin starting at about the age of

6   16.  Is that right?

7        INMATE RUIZ:  Yes.

8        PRESIDING COMMISSIONER FISHER:  And you had

9   been drinking since you were 14?

10       INMATE RUIZ:  About that, yes.

11       PRESIDING COMMISSIONER FISHER:  Okay.  The

12  only other thing that it mentions is that you

13  used marijuana occasionally?

14       INMATE RUIZ:  Yes.

15       PRESIDING COMMISSIONER FISHER:  Is that

16  correct?  Is there anything that I've overlooked

17  as far as drugs that you've used in the past?

18       INMATE RUIZ:  No.

19       PRESIDING COMMISSIONER FISHER:  Okay.  And

20  how old were you when this happened?

21       INMATE RUIZ:  About 36, 37.

22       PRESIDING COMMISSIONER FISHER:  I thought

23  you were in your 30s.

24       INMATE RUIZ:  Yeah.

25       PRESIDING COMMISSIONER FISHER:  And how

26  long had you been on methadone at that point?

27       INMATE RUIZ:  About four months.

14

1      **PRESIDING COMMISSIONER FISHER:**  So you were

2  using -- using heroin from the age of 16 until

3  shortly before this?

4      **INMATE RUIZ:**  Not -- since the last time I

5  got out in January -- no, June of '80, that's

6  when I got on it.

7      **PRESIDING COMMISSIONER FISHER:**  Okay.

8      **INMATE RUIZ:**  So I wouldn't use heroin.

9      **PRESIDING COMMISSIONER FISHER:**  Okay.  But

10  any time you were on the street from the time

11  you were about 16 you were using heroin?

12      **INMATE RUIZ:**  Just heroin, yes.

13      **PRESIDING COMMISSIONER FISHER:**  Okay.  All

14  right.  Let's see.  All right.  Let's see.  It

15  says you dropped out of school when you were in

16  the 10th grade when you were about 18, and it

17  was to go to work.  Is that right?

18      **INMATE RUIZ:**  Yes.

19      **PRESIDING COMMISSIONER FISHER:**  Okay.  And

20  I know you have a son and a couple of daughters.

21  Is that right?

22      **INMATE RUIZ:**  Yes.

23      **PRESIDING COMMISSIONER FISHER:**  And are you

24  married again?

25      **INMATE RUIZ:**  No.

26      **PRESIDING COMMISSIONER FISHER:**  I don't

27  think there's anything else that I have

15

1  questions about related to your history.  I

2  think -- I've reviewed the prior transcript and

3  the file.  Is there anything that you think I've

4  overlooked about your life before this offense

5  that would be important for us to know?

6      INMATE RUIZ:  No.

7      PRESIDING COMMISSIONER FISHER:  Okay.  If

8  you'll turn your attention to -- oh, wait a

9  minute.  Before I do that, let me ask you a

10  question quickly here about parole plans.  When

11  you receive a parole date, what do you plan on

12  doing?  Where do you plan on living?

13      INMATE RUIZ:  I already have a job

14  established when I do get out.  I'll be staying

15  with my daughter.

16      PRESIDING COMMISSIONER FISHER:  Okay.

17      INMATE RUIZ:  When I get paroled.  She sent

18  a letter to my counselor.

19      PRESIDING COMMISSIONER FISHER:  Okay.

20      INMATE RUIZ:  It should be in my file, in

21  the Board --

22      PRESIDING COMMISSIONER FISHER:  Is that

23  Julia?

24      INMATE RUIZ:  Yes.

25      PRESIDING COMMISSIONER FISHER:  Julia

26  Montoya (phonetic).  Yeah, she says that -- she

27  says, "He's invited to live with me and my

16

```
 1  family.  We've offered him our home indefinitely
 2  and preferably permanently.  We've also offered
 3  to assist him with locating employment, as well
 4  as any other support he may need while
 5  transitioning into his new life.  My husband and
 6  I are committed to helping my father and look
 7  forward to doing so."  And then I have a letter
 8  from Joe Ruiz, and who is he?
 9       INMATE RUIZ:  He's just an acquaintance.
10       PRESIDING COMMISSIONER FISHER:  Just a
11  coincidence that it's the same last name?
12       INMATE RUIZ:  Yeah, same last name.
13       PRESIDING COMMISSIONER FISHER:  Okay.  Says
14  he's a real estate broker.  Has been in sales
15  for other 10 years.  It says this letter is to
16  inform you that if you ever need a job he would
17  be hired here at this office.  He would be able
18  to do many things, installing signs, flyers,
19  house cleaning, (indiscernible) with other
20  agents.  And then let's see here.  This is from
21  Louise Slater (phonetic).  This is the mother of
22  -- is this your daughter or is this a daughter-
23  in-law?
24       INMATE RUIZ:  That's my son's ex-wife.
25       PRESIDING COMMISSIONER FISHER:  Okay.  She
26  says she's the mother of your grandchildren.
27       INMATE RUIZ:  Uh-huh.
```

17

1     **PRESIDING COMMISSIONER FISHER:**  And I guess

2     she and the children have been in contact with

3     you --

4         **INMATE RUIZ:**  Yes.

5         **PRESIDING COMMISSIONER FISHER:**  -- while

6     you've been in prison, right?  Okay.  She says

7     this has been very helpful to me when it's been

8     difficult to keep a male influence in their

9     lives.  She says that you've advised the

10    children on how they should structure their

11    lives and to know when the wrongs are always

12    truthfully wrong.  She talks about wanting to

13    give the children the opportunity to meet you.

14    She says, "In the eventuality that Mr. Ruiz

15    might be released, he is welcome to come and

16    reside in our home.  I would try my best to help

17    him acquire gainful employment and to become a

18    productive citizen in today's society.  I am

19    currently in the process of furthering my

20    education in the field of computers and feel

21    that Mr. Ruiz's presence in our home could

22    greatly benefit the grandchildren.  I hope I

23    will try to create a lasting and stronger bond

24    in our relationship."  All right.  Anything else

25    about parole plans that isn't in these letters

26    that we should know about?

27        **INMATE RUIZ:**  No.

18

1      **PRESIDING COMMISSIONER FISHER:**  Okay.  All

2   right.  Then now if you'll turn your attention

3   to Commissioner Harmon.  He's going to go

4   through your institutional behavior with you.

5      **DEPUTY COMMISSIONER HARMON:**  Hello again.

6      **INMATE RUIZ:**  Hello.

7      **DEPUTY COMMISSIONER HARMON:**  I'd like to --

8   before Mr. Ruiz, the first thing I want to do

9   here is to make sure the record is correct.

10   Listen carefully, and if it's incorrect, let me

11   know and we'll correct it.  Okay.

12      **INMATE RUIZ:**  Okay.

13      **DEPUTY COMMISSIONER HARMON:**  It does show

14   that your last hearing was October 1st of 2003.

15      **INMATE RUIZ:**  Yes.

16      **DEPUTY COMMISSIONER HARMON:**  At that time

17   you received a two-year denial.

18      **INMATE RUIZ:**  Yes.

19      **DEPUTY COMMISSIONER HARMON:**  That would you

20   say subsequent hearing number five.  You were

21   received at Pelican Bay State Prison January

22   24th, 1990 from CCI.

23      **INMATE RUIZ:**  Yes.

24      **DEPUTY COMMISSIONER HARMON:**  Your current

25   custody level is Maximum-S.  Your classification

26   score today is 29?

27      **INMATE RUIZ:**  Yes.

19

1       **DEPUTY COMMISSIONER HARMON:**   Okay.   And let

2   the record reflect that there will be

3   confidential information used today.   The victim

4   wrote a letter opposing parole, so I want you to

5   understand that.   What we do at this point is,

6   once again, we focus primarily on the period of

7   time since your last hearing.   I may leave out

8   areas that are important to you.   Listen

9   carefully, and I'll give you an opportunity to

10  add to that.   The counselor whose last name I

11  can't read.   It's just written in there.   Is it

12  Barnts?

13      **INMATE RUIZ:**   Barnts.

14      **DEPUTY COMMISSIONER HARMON:**   B-A-R-N-T-S.

15  Okay.   For the transcriber it is typed there.   I

16  missed it.   Okay.   I does show that from June

17  '03 to June '04, it says that you remained at

18  Pelican Bay during the entire time in the

19  security housing unit due to your validation as

20  a member of the Mexican Mafia prison gang.   Your

21  placement score was 39 points during the entire

22  period.   There was no work, no vocational work.

23  It says that you were involved in the personal

24  reading program.   It showed no group activities,

25  no psychiatric treatment, no discipline.   Then

26  from June '04 to September '05, the counselor

27  writes that you remained at Pelican Bay during

20

1  the entire time in the SHU unit, and that was

2  based on your validation as a gang member.  It

3  says that your placement score was 35 points

4  during the entire period.  There was no work, no

5  vocational programs.  It says that you still

6  participated in the personal reading program.

7  There was no psychiatric treatment, and there

8  was no discipline.

9      INMATE RUIZ:  No, sir.

10     DEPUTY COMMISSIONER HARMON:  And then from

11 June 10th of '05 to November 13th of '05, it

12 show that everything remains the same.  There's

13 no changes except your placement score dropped

14 to 33, and no discipline, no psych treatment.

15 Once again, everything is pretty much the same.

16 It doesn't make note of the reading program.

17 But that brings us up to November 13th of '05,

18 and here we are in May of '06, so several months

19 have gone by.  Can you kind of give us an idea

20 of what, if anything, has changed over the last

21 six months, let's say.

22     INMATE RUIZ:  Well, I've been reading these

23 law books.  I got that memorandum right there,

24 and it's hard, you know, the words are hard to

25 put together on the paperwork, but I'm trying to

26 learn something.

27     DEPUTY COMMISSIONER HARMON:  Okay.

21

1      **INMATE RUIZ:**  At least about the law.

2      **DEPUTY COMMISSIONER HARMON:**  Okay.

3      **INMATE RUIZ:**  Be writing more to my

4  grandkids; seen my granddaughter two months ago.

5  She come up.  Pretty big.

6      **DEPUTY COMMISSIONER HARMON:**  Pretty

7  beautiful?

8      **INMATE RUIZ:**  Oh man, yeah.  I didn't have

9  no grandkids when I was arrested for this case,

10  and I'm sure, you know, I'm going to stay out

11  there this time, if I get the opportunity.

12      **DEPUTY COMMISSIONER HARMON:**  Okay.

13      **INMATE RUIZ:**  Beautiful kids.  I mean, I

14  got pictures all --

15      **DEPUTY COMMISSIONER HARMON:**  Good for you.

16      **INMATE RUIZ:**  I got a thousand pictures, I

17  think.

18      **DEPUTY COMMISSIONER HARMON:**  Got them all

19  over your house?

20      **INMATE RUIZ:**  Yeah.

21      **DEPUTY COMMISSIONER HARMON:**  Let me ask you

22  this, what about other activities?  Do you do

23  anything else?  Are you a spiritual man?  Do you

24  participate in any time of religious --

25      **INMATE RUIZ:**  I've written to Crossroads.

26      **DEPUTY COMMISSIONER HARMON:**  Okay.

27      **INMATE RUIZ:**  I've taken some tests with

22

1    them, but this was back in '94, I think it was.

2    And at the time I didn't have enough money to

3    get the envelopes and send them back the test.

4    That was about it.

5        DEPUTY COMMISSIONER HARMON:  Okay.  Okay.

6    And looking at your history of being

7    incarcerated on this crime, it show that back in

8    1980 you completed the vocational body and

9    fender program?

10       INMATE RUIZ:  Yes, in Old Folsom.

11       DEPUTY COMMISSIONER HARMON:  I bet cars

12   have changed in cars in 26 years?

13       INMATE RUIZ:  There's a lot of plastic now.

14       DEPUTY COMMISSIONER HARMON:  Your work is

15   limited.  You've worked in the license plate

16   factory back in '77?

17       INMATE RUIZ:  Yes.

18       DEPUTY COMMISSIONER HARMON:  Did some work

19   there, and of course, your vocational program,

20   but how many years has it been now since you

21   held a job in prison?

22       INMATE RUIZ:  Geez.

23       DEPUTY COMMISSIONER HARMON:  I couldn't

24   find anything.

25       INMATE RUIZ:  Since '90 -- no, since '82.

26       DEPUTY COMMISSIONER HARMON:  '82.

27       INMATE RUIZ:  Yeah.

23

1        **DEPUTY COMMISSIONER HARMON:**  That's what

2  I've thought.

3        **INMATE RUIZ:**  Then they put me in the SHU.

4  Then they let me out of the SHU.  Then from

5  there they transferred me to San Quentin in '84,

6  I've think it was.  From there to Tehachapi, and

7  from there here.

8        **DEPUTY COMMISSIONER HARMON:**  Okay.  You

9  took a TABE test in 2000.  It showed your

10  reading level at 5.8.

11        **INMATE RUIZ:**  Yeah.

12        **DEPUTY COMMISSIONER HARMON:**  And it showed

13  that you still have not required your GED.

14        **INMATE RUIZ:**  Yes.

15        **DEPUTY COMMISSIONER HARMON:**  Now, have you

16  given any thought to doing a GED express

17  program?

18        **INMATE RUIZ:**  I went to that, and they said

19  that I've need to upgrade my reading.  And that

20  would have to wait until my custody changed, so

21  I've could have a one on one.

22        **DEPUTY COMMISSIONER HARMON:**  Okay.

23        **INMATE RUIZ:**  This is what they said to me,

24  so they didn't send me no more work.

25        **DEPUTY COMMISSIONER HARMON:**  Okay.

26        **INMATE RUIZ:**  I've took the test, but they

27  said my reading wasn't up to par.

24

1      **DEPUTY COMMISSIONER HARMON:**  Okay.  So you

2  want to get your GED at some point?

3      **INMATE RUIZ:**  I've would like to get that,

4  yes.

5      **DEPUTY COMMISSIONER HARMON:**  Okay.  In the

6  area of therapy and self-help activities since

7  you came into prison for the crime I really

8  haven't found any participation.  Has there been

9  anything you've ever been involved in?

10      **INMATE RUIZ:**  Well, I've went to see the

11  psych a few times, and he's -- they said that

12  they had stopped it.  That they didn't have

13  enough funds to continue having me go down and

14  talk to him.  We talk about things I've did in

15  my past and schooling and all this.  Now, they

16  just come to the door and ask what you red and

17  that was it.  That was the last time -- when

18  I've came to the Board, that's what they put on

19  there.

20      **DEPUTY COMMISSIONER HARMON:**  Before going

21  into the SHU years ago when you were in the main

22  line, did you get involved in any programs at

23  all?

24      **INMATE RUIZ:**  No, I was just working.

25      **DEPUTY COMMISSIONER HARMON:**  That's what I

26  thought, okay.

27      **INMATE RUIZ:**  Yeah.  I was on the waiting

25

1   list there to go back down to the lower yard in

2   Old Folsom for back -- get a refresher course on

3   body and fender, and they said I had too much

4   time to go down to that yard down there because

5   it was too close to the fence or something.  So

6   I got a job in the kitchen as a cook, learning

7   how to cook things, you know, putting everything

8   together.

9        **DEPUTY COMMISSIONER HARMON:**  And let's see,

10  I didn't find any laudatories.  I found that

11  there's been four 115s, the last one January

12  11th, 1986 for stimulants and sedatives?

13       **INMATE RUIZ:**  Yes.

14       **DEPUTY COMMISSIONER HARMON:**  Five 128s, the

15  last one February 6 of '01 for being on that

16  hunger strike.  First of all, I want to make

17  sure that it's understood by you that the fact

18  that you've been disciplinary free with no

19  serious violations since 1986 is commendable.

20       **INMATE RUIZ:**  Yes.

21       **DEPUTY COMMISSIONER HARMON:**  And I'm sure

22  there's times where you've been challenged?

23       **INMATE RUIZ:**  Oh, yeah.

24       **DEPUTY COMMISSIONER HARMON:**  I know you've

25  been stabbed.

26       **INMATE RUIZ:**  Yes.

27       **DEPUTY COMMISSIONER HARMON:**  You got

26

1  stabbed four times years ago.  I know that.

2      INMATE RUIZ:  Yeah.

3      DEPUTY COMMISSIONER HARMON:  In fact, the

4  guy that stabbed you are both dead now, aren't

5  they?

6      INMATE RUIZ:  That was just one person.

7      DEPUTY COMMISSIONER HARMON:  Was it just

8  one?

9      INMATE RUIZ:  Yeah.

10      DEPUTY COMMISSIONER HARMON:  Okay.

11      INMATE RUIZ:  And that was in '88, I think,

12  in Tehachapi, when I was in Tehachapi.

13      DEPUTY COMMISSIONER HARMON:  Yeah, you're

14  lucky.

15      INMATE RUIZ:  It was just a little piece of

16  iron he had or something.  I was handcuffed when

17  I came in from the yard, and he just -- I

18  thought he was playing around.  Just a few

19  little holes.  It wasn't bad.

20      DEPUTY COMMISSIONER HARMON:  You got a

21  moniker.  What's your moniker?  I thought that

22  was kind of interesting.

23      INMATE RUIZ:  The who?

24      DEPUTY COMMISSIONER HARMON:  Your moniker,

25  what do they call you?

26      INMATE RUIZ:  Silent George.

27      DEPUTY COMMISSIONER HARMON:  Silent George?

27

1        INMATE RUIZ:  Yeah, I'm quiet.

2        DEPUTY COMMISSIONER HARMON:  Okay.  So

3   you've been in SHU now how long?

4        INMATE RUIZ:  Years and years, since '82.

5        DEPUTY COMMISSIONER HARMON:  Now, and you

6   and I talked about this, I think before.

7        INMATE RUIZ:  Yeah.

8        DEPUTY COMMISSIONER HARMON:  What are you

9   going to do about that to get out there and see

10  that granddaughter?  What are you going to do

11  about it?

12       INMATE RUIZ:  Well, to keep her safe I

13  can't debrief, and I'm not going to put their

14  lives in jeopardy, you know.  People say oh, but

15  that don't happen.  I know that happens.  I've

16  seen it in the streets happen.

17       DEPUTY COMMISSIONER HARMON:  You're what,

18  64?

19       INMATE RUIZ:  Yeah, I'll be 64 in October.

20       DEPUTY COMMISSIONER HARMON:  October?

21       INMATE RUIZ:  Yeah.

22       DEPUTY COMMISSIONER HARMON:  I want to ask

23  you about this.  I was looking at your file, and

24  I noted that you've been validated as a member

25  of the Eme since back in the '70s.  Now, you're

26  up for your next review in January '07, right?

27       INMATE RUIZ:  Yeah.

28

1      DEPUTY COMMISSIONER HARMON:   Now, I notice

2  that '03, November '03 they used 10 of 19

3  documents to validate you again as a member of

4  the Eme.  I mean --

5      INMATE RUIZ:   They said they missed

6  something in my file, and they said they're

7  going to have to give me six more years for

8  that.  I asked them what it was, and they said

9  that's confidential.  If I don't know what it

10 is, I don't know how to correct anything.

11     DEPUTY COMMISSIONER HARMON:   Right.

12     INMATE RUIZ:   You know --

13     DEPUTY COMMISSIONER HARMON:   Right.

14     INMATE RUIZ:   So --

15     DEPUTY COMMISSIONER HARMON:   So you think

16 you're going to turn up --

17     INMATE RUIZ:   Well, they'll come up with

18 something else, probably.

19     DEPUTY COMMISSIONER HARMON:   You think

20 you're going to get -- extend your stay then?

21     INMATE RUIZ:   Probably from finding my name

22 somewhere or something they say that's active.

23     DEPUTY COMMISSIONER HARMON:   Right.

24     INMATE RUIZ:   I can't change what they

25 think.

26     DEPUTY COMMISSIONER HARMON:   Yeah, my point

27 was that they found 10 of 19 supporting

29

1  documents last time in '03.  Are they going to

2  find that many again?

3       **INMATE RUIZ:**  I don't see why.

4       **DEPUTY COMMISSIONER HARMON:**  Are you a

5  member of the Eme?

6       **INMATE RUIZ:**  No, I'm not; no.

7       **DEPUTY COMMISSIONER HARMON:**  Have you ever

8  been?

9       **INMATE RUIZ:**  No.

10      **DEPUTY COMMISSIONER HARMON:**  You've been

11  down a long time.

12      **INMATE RUIZ:**  I know a lot of them.  Don't

13  get me wrong, you know, I've hung with them at

14  Old Folsom, San Quentin.  I never did anything

15  in the name of any gang, any gang.

16      **DEPUTY COMMISSIONER HARMON:**  You should of

17  been out years ago; you know that?

18      **INMATE RUIZ:**  Yeah, well, I'm not going to

19  become an informant.  That's putting my life in

20  danger and my kids.

21      **DEPUTY COMMISSIONER HARMON:**  Okay.  I just

22  wanted to see where you're going, you know,

23  you're getting older?

24      **INMATE RUIZ:**  Yeah.

25      **DEPUTY COMMISSIONER HARMON:**  I just don't

26  know what you want to do with the rest of your

27  life.  That's why I'm kind of asking you.

30

1      **INMATE RUIZ:**  I want to spend it with my

2   kids and my grandkids.

3      **DEPUTY COMMISSIONER HARMON:**  Okay.  Well, I

4   want to do get your thoughts.  Your counselor

5   says here under assessment, it says the inmate

6   indicated there was no foreseeable problems with

7   his residence plan or his job.  He believe that

8   he will be successful in his pursuit of a good

9   life away from prison and with his family.  Ruiz

10  is a validated member of the Mexican Mafia,

11  which may interfere with his attempt to separate

12  from the crime -- or from crime.  The counselor

13  says here under summary, in part, it says he'd

14  like you to do several things.  One is remain

15  disciplinary free, which you've been doing.

16     **INMATE RUIZ:**  Yeah.

17     **DEPUTY COMMISSIONER HARMON:**  Two, upgrading

18  educationally and vocationally.  Three, in

19  enrolling in a self-help course.  And four,

20  reducing custody level by submitting to the

21  debriefing process.  Have you looked at any

22  other possible programs, like anger management

23  or anything else that's video like some of the

24  other guys are doing?

25     **INMATE RUIZ:**  Yeah, I've read books on

26  anger management, but they're all the same.  I

27  got the books like for alcoholism, NA, but they

31

1  don't have books on NA.  They have for

2  alcoholics.

3      **DEPUTY COMMISSIONER HARMON:**  How about that

4  Success from the Inside Out series?  One of the

5  guys walked in --

6      **INMATE RUIZ:**  I never heard of that one.

7      **DEPUTY COMMISSIONER HARMON:**  -- with that

8  one -- Success from the Inside Out series?

9      **INMATE RUIZ:**  Yeah, I haven't heard of

10  that.

11      **DEPUTY COMMISSIONER HARMON:**  Let me tell

12  you something.  Let me tell you what they came

13  back with.  Okay.  They came back with a life

14  skills, anger management program.  They came

15  back with a stress management program.  They

16  came back with a victim awareness program.  Why

17  don't you check with your counselor on that and

18  see if you get involved with that, why not?

19      **INMATE RUIZ:**  I've asked the counselor a

20  lot of times.  Derusha (phonetic), when she was

21  here.

22      **DEPUTY COMMISSIONER HARMON:**  Okay.

23      **INMATE RUIZ:**  And she say said she didn't

24  know of no addresses to give me.  I don't know

25  if --

26      **DEPUTY COMMISSIONER HARMON:**  Okay.  That's

27  going to be in your transcript today, what I

32

1   just said --

2        INMATE RUIZ:   Yes.

3        DEPUTY COMMISSIONER HARMON:   -- Success

4   from the Inside Out series.  Why don't you look

5   at something like that or other video programs

6   that may be available to you.  Okay.

7        INMATE RUIZ:   All right.

8        DEPUTY COMMISSIONER HARMON:   See if that

9   will help you.  Have I missed any of your

10  accomplishments?

11       INMATE RUIZ:   Well, in '92 we made a video

12  for the kids up there for -- in San Diego.  I

13  don't know if you got that on record or not.  It

14  should be there.

15       DEPUTY COMMISSIONER HARMON:   Okay.

16       INMATE RUIZ:   From the Barrio Station,

17  Logan.  Rachel Ortiz was there.  They came up.

18  They had a big video thing here.  They showed

19  the cells, and they talked to four of us from

20  San Diego.  We talked to the kids, you know,

21  saying this is what to expect if they do mess

22  up.

23       DEPUTY COMMISSIONER HARMON:   And you got a

24  chrono?

25       INMATE RUIZ:   Yeah, I got a chrono.  I got

26  paperwork, everything.

27       DEPUTY COMMISSIONER HARMON:   How about

33

1   anything else -- good, what else have you done?

2       **INMATE RUIZ:**  That's about it.

3       **DEPUTY COMMISSIONER HARMON:**  Okay.

4       **INMATE RUIZ:**  Just staying out of trouble.

5       **DEPUTY COMMISSIONER HARMON:**  Okay.  And

6   you've been doing a good job of that.  That's

7   for sure.  Okay.  I'm going to move onto your

8   doctor's reports, but before we do, I want to

9   ask you question.  It's an important question.

10  Do you believe you pose a risk to the safety of

11  the people outside of the prison walls today?

12      **INMATE RUIZ:**  No, I don't.

13      **DEPUTY COMMISSIONER HARMON:**  What do you

14  believe makes you a different man today than the

15  man that came into prison for the life crime?

16      **INMATE RUIZ:**  My age, for one.  I have no

17  desire to go out there and use drugs or even

18  drink.  Like I said, I just came into my

19  grandkids, you know.  To me family is very

20  important to me, you know.  Well, you can see --

21  you fall in love with those kids, man.  My

22  daughter has come up and brought her little

23  kids.  They're up on the window just touching

24  the window and stuff, didn't even know me and

25  it's just a good feeling, a feeling I want to

26  keep.

27      **DEPUTY COMMISSIONER HARMON:**  Good for you.

34

1    **INMATE RUIZ:**  Yeah.

2    **DEPUTY COMMISSIONER HARMON:**  How about

3    anything else?

4    **INMATE RUIZ:**  Well, I'm going to work.  I

5    know I have to.  My sickness.  I got diabetic.

6    It can only get worse, if I don't take care of

7    it.  You can't do that my using or drinking.

8    That would just kill me.  My dad had diabetes,

9    and he lived until he was 84, but he took care

10   of himself.  So that's about it.

11   **DEPUTY COMMISSIONER HARMON:**  Okay.

12   **INMATE RUIZ:**  If I got to opportunity to go

13   to main line and work, I'd do it.  But since I

14   won't debrief, they won't let me go out there.

15   **DEPUTY COMMISSIONER HARMON:**  Okay.  Back on

16   August '03 you had a report that was done by D.

17   Costiloe, C-O-S-T-I-L-O-E, a licensed clinical

18   social worker.  And it talked about your mental

19   -- as part of your mental review -- mental

20   health review, and it's an addendum.  And what

21   it says here, it talks about the book that

22   you've read?

23   **INMATE RUIZ:**  Yeah.

24   **DEPUTY COMMISSIONER HARMON:**  "Adult

25   Children of Alcoholics.."

26   **INMATE RUIZ:**  Yeah.

27   **DEPUTY COMMISSIONER HARMON:**  Okay.  Will

35

1  never replace me -- "It Will Never Happen to

2  Me," excuse me.  "SOS Sobriety, Safe Ourselves."

3      **INMATE RUIZ:**  Yeah.

4      **DEPUTY COMMISSIONER HARMON:**  And the last

5  one was "First Year Sobriety.  "Do you remember

6  that?

7      **INMATE RUIZ:**  Yeah.

8      **DEPUTY COMMISSIONER HARMON:**  What did you

9  learn from those?

10      **INMATE RUIZ:**  If you need help you got to

11  ask for it.  See, a lot of us go out there and

12  we don't -- I guess it's a macho thing where you

13  don't want to ask for any help, but it shows you

14  that you can get -- you're not by yourself out

15  there.  Like we say, well, I'm only hurting

16  myself, but that's not true.  We have a family,

17  people we love, people that love us, and that's

18  -- I don't want to go through that no more.

19      **DEPUTY COMMISSIONER HARMON:**  Okay.  The --

20  what I tried to do is at least touch on the two

21  most recent reports just to get -- since there's

22  a difference of opinion in the last report.

23  Prior to that was from M. Backlund, B-A-C-K-L-U-

24  N-D.

25      **INMATE RUIZ:**  Yeah.

26      **DEPUTY COMMISSIONER HARMON:**  A

27  psychologist.  This was from October of 2000.

36

1    Do you remember meeting with Dr. Backlund?

2        **INMATE RUIZ:**  Yeah, I think so.

3        **DEPUTY COMMISSIONER HARMON:**  Okay.  And

4    that doctor does a more extensive report.  And

5    taking that in part, the doctor starts out with

6    your history, which has been discussed with the

7    Commissioner earlier, so I'll go directly to the

8    area of mental health evaluation.  And the

9    doctor's observations of you starts out here in

10   your mental health status evaluation, it says

11   here at the time it says his judgment and

12   insight into his situation is good.  He denied

13   any mood symptoms and his affect appeared broad

14   and appropriate to thought.  There were no

15   hallucination, delusions or other peculiarities

16   suggestive of a thought disorder or psychosis.

17   Interpersonal, he was cooperative and friendly.

18   The mental status examination did not suggest to

19   this clinician any signs of a serious mental

20   illness.  Under diagnostic formulation, under

21   access one, other substance abuse in sustained

22   full remission in a controlled environment

23   (alcohol and opiate).  Access two, antisocial

24   personality disorder (appears to have improved

25   markedly).  And access five, a GAF of 88.  In

26   the area of conclusions and recommendations, in

27   part, the doctor writes, his ability to make a

37

1  successful transition to the community on parole

2  would appear dependent upon his remaining

3  disciplinary free, to initiating and sustaining

4  participation in self-help programs (custody

5  status permitting, of course), continuing to

6  develop and improve vocational skills, reducing

7  his classification score, and developing the

8  necessary insight into his own contribution into

9  his present circumstances and his demonstrated

10  lack of virtue by someone initially entitled to

11  the enjoyment of liberty.  Now, that was from

12  Dr. Backlund.  So Mr. Ruiz, what I've done, once

13  again, is I've taken part of the two most recent

14  doctor's reports.  I've taken parts of your

15  counselor's reports.  I've taken parts of your

16  entire institutional adjustment.  I may have

17  left areas that are very important to you and

18  your counselor.  I'm going to return to the

19  Chair because we're going to go into

20  questioning.  Now, before I do that, is there

21  anything that you wish to add to any of the

22  areas that I covered today?

23      INMATE RUIZ:  No.

24      DEPUTY COMMISSIONER HARMON:  Did we cover

25  things okay?

26      INMATE RUIZ:  Yes.

27      DEPUTY COMMISSIONER HARMON:  Counselor?

38

1        **ATTORNEY FALLMAN:**  Yes.

2        **DEPUTY COMMISSIONER HARMON:**  Thank you.

3    I'll return to the Chair.

4        **PRESIDING COMMISSIONER FISHER:**  Okay.   I

5    don't really have any other question that

6    haven't been answered.   Anything else?

7        **DEPUTY COMMISSIONER HARMON:**  Yeah.  Mr.

8    Ruiz, I want to ask you something pretty simple.

9        **INMATE RUIZ:**  Yeah.

10        **DEPUTY COMMISSIONER HARMON:**  Do you know

11    the names of your victims?

12        **INMATE RUIZ:**  Just the Hickman or Heckam,

13    the one I took into the store.

14        **DEPUTY COMMISSIONER HARMON:**  Do you

15    remember his name, his full name?

16        **INMATE RUIZ:**  No.

17        **DEPUTY COMMISSIONER HARMON:**  Do you

18    remember --

19        **INMATE RUIZ:**  It's been a long time.

20        **DEPUTY COMMISSIONER HARMON:**  -- do you

21    remember the names of the other two victims?

22        **INMATE RUIZ:**  No.

23        **DEPUTY COMMISSIONER HARMON:**  You don't

24    remember any of them?

25        **INMATE RUIZ:**  No.

26        **DEPUTY COMMISSIONER HARMON:**  Don't you

27    think that's pretty important?

39

1       INMATE RUIZ:  Yeah.

2       DEPUTY COMMISSIONER HARMON:  Did you do a C

3    file review?

4       INMATE RUIZ:  No.

5       DEPUTY COMMISSIONER HARMON:  Maybe you

6    should do that next time.  Do an Olson review if

7    there's a next time.  That's pretty important.

8       INMATE RUIZ:  Yeah.

9       DEPUTY COMMISSIONER HARMON:  What do you

10   think -- what do you think about those victims?

11   What do you think about them today?

12      INMATE RUIZ:  I kind of feel sorry for them

13   that I put them through that.  At the time I

14   wasn't thinking.  I wasn't thinking I was

15   hurting them.  That's all.

16      DEPUTY COMMISSIONER HARMON:  That's all?

17      INMATE RUIZ:  Yeah.

18      DEPUTY COMMISSIONER HARMON:  Okay.  I'll

19   return to the Chair.  Thank you.

20      PRESIDING COMMISSIONER FISHER:  Thank you.

21   And I almost neglected, Mr. Ruiz, to tell you

22   that we have a letter from the San Diego DA's

23   office.  Originally, they were going to appear

24   by video conference and were not able to, so

25   they sent over a statement.  And basically, it's

26   talking about their position on whether or not

27   you're suitable for parole.  It says that you've

40

```
1   not programmed in a manner befitting a man
2   worthy of release into society.  It says,
3   "Cordially, based on this and the concerns
4   specified in our recent letter, we'd like to
5   reiterate that we're adamantly opposed to a
6   grant of parole for Mr. Ruiz."  The recent
7   letter she's talking about -- he's talking about
8   is in April of '06.  And it says, "The facts in
9   this case are well documented in our previous
10  letter submitted April 2001.  A copy of this
11  letter is enclosed for your convenience.  Also
12  enclosed are the written victim impact
13  statements of Bruce Peckam for the Board's
14  consideration.  A review of the prisoner's file
15  shows that he remains unsuitable for parole.
16  Mr. Ruiz does not express any remorse for --
17  remorse for or insight into his long criminal
18  past.  Ruiz also remains a validated member of
19  the Mexican Mafia prison gang.  According to
20  institutional gang coordinator D.T. Hawkes, H-A-
21  W-K-E-S, Ruiz is an old-time member, who has
22  been involved with the Mexican Mafia since the
23  '70s.  Due to his longstanding affiliation with
24  this prison gang, Ruiz remains housed in SHU.
25  And as a direct consequence, he's been unable to
26  both upgrade vocationally and educationally.
27  It's our position that there's been no change in
```

41

1    the circumstances which would warrant a finding

2    of suitability.  Ruiz has no concrete of

3    realistic parole plans.  The current board

4    report assessment states Ruiz is a validated

5    member of the Mexican Mafia, which may interfere

6    with his attempt to separate from crime."  It

7    says, "Ruiz is a career criminal who remains

8    unpredictable and a unreasonable risk to society

9    if released, and the people of the state of

10   California respectfully oppose parole."  This is

11   signed by Richard Saks (phonetic) on behalf of

12   Bonnie Dumanis, D-U-M-A-N-I-S.  And I think

13   that's everything I have.  Counsel, do you have

14   any questions for the inmate?

15       **ATTORNEY FALLMAN:**  No questions.

16       **PRESIDING COMMISSIONER FISHER:**  Okay.

17   Would you like to go ahead and close?

18       **ATTORNEY FALLMAN:**  Yes.  I used to

19   prosecute SHU inmates, and this one is different

20   from almost any that I've ever seen because I

21   believe Mr. Harmon said that he doesn't have a

22   115 since 1986.  And -- so he's stuck.  He's 63

23   years old.  He's got hepatitis C and he's got

24   diabetes, and I think his violence potential

25   speaks best by the record of no violence -- or

26   no 115s whatsoever since 1986.  And when you

27   look at the life inmates that we normally see,

42

1   most of them have hurt one or more people here.

2   Yeah, he kidnapped for robbery, but he didn't

3   physically hurt anybody.  He needs to, I guess,

4   a little bit work on the idea of the

5   psychological trauma that he put on these

6   people, but it's not the kind of thing that we

7   see in most SHU inmates.  That's why I say he's

8   different.  I believe he does have some skills.

9   He has fender work that he's done.  He can do

10  body work.  He's been a painter.  He was a cook

11  that I learned for the time today from Mr.

12  Harmon at Old Folsom.  He has a 11th grade

13  education.  He has a job working in a real

14  estate office cleaning up and doing odd jobs.

15  He can stay either with his daughter or -- oh

16  no, with his daughter in San Diego.  He has done

17  -- the record shows that he's done self -- at

18  least four self-help readings since he's been

19  incarcerated.  He has very low points for a SHU

20  inmate.  In fact, at 33 points, normally if

21  there weren't this so-called gang validation, he

22  wouldn't even be in a level four prison because

23  I think it takes 52 or 53 points, something like

24  that for level four, so again he's different

25  from the norm that we see in SHU.  He has

26  participated in reading -- reading program.  He

27  really wants to be near his grandchildren.  Even

43

1   though he does need work in the remorse area, at

2   least for the psychological harm that he's

3   caused the people, Dr. Backlund has recently

4   said that he has good insight. And so not

5   withstanding the negative at the beginning many

6   years ago, this man has improved. He's -- I

7   would love to see this guy get a chance to go

8   out and be with those grandkids. He's not going

9   to do drugs again because of his age and his

10  insight, and he also realizes that that plus

11  diabetes would, probably, be the end of him

12  pretty quick. He's caught in a catch 22. He's

13  told me in my interviews with him, and if he

14  doesn't want me to give this -- well, he's

15  giving it away myself, so I don't think he's

16  going to get mad if I say it.

17      **INMATE RUIZ:**  No.

18      **ATTORNEY FALLMAN:**  But I mean, the reason

19  he can't debrief is because he's afraid that

20  they will go get these kids and these grandkids.

21  And I prosecuted a case here where two Aryan

22  Brotherhood guys hired a black guy to get into

23  it the have his brother-in-law in the Sacramento

24  Police or Sheriff's Department get into a clutch

25  machine, and since they couldn't get to him when

26  he debriefed and testified for me against them

27  in two murder cases on the Aryan Brotherhood,

44

1   they wanted the brother-in-law in Sacramento to

2   find out about his family so they could go kill

3   his daughter in another state.  So I know from

4   prosecuting that these gangs do look for family

5   members to kill.  That was a case of Brian Healy

6   (phonetic) if anybody -- Brian Healy is the

7   crime victim, and the murderers who wanted to go

8   out and kill his daughter were two guys in SHU

9   here, Rascal is the guy's moniker, Grizzle,

10   Scott Grizzle is his name and Gary Littrell,

11   both members of the Aryan Brotherhood.  So I

12   know that there -- from testimony of a black

13   inmate that, at least the Aryan Brotherhood,

14   will try to kill family on the street if they

15   can't get to somebody that they think has

16   snitched on him.  So it's not because he wants

17   to go out on the street and do violence for the

18   Mexican Mafia that he's not debriefing.  He's

19   not debriefing to make sure that these children

20   that he loves stays alive, and maybe that's

21   going to cause him to stay in prison for the

22   rest of his life, the fact that he won't be a

23   snitch, but I sure hope not.  Because if

24   violence potential means anything, this is the

25   one guy that should get out because no violence

26   -- and even if you look at the 115s before '86,

27   I don't think they were for violence.  I could

45

1  be wrong on that.  Am I right on that?

2       **INMATE RUIZ:**  You're right.

3       **ATTORNEY FALLMAN:**  So that's what I have to

4  say.

5       **PRESIDING COMMISSIONER FISHER:**  Thank you.

6  Mr. Ruiz, is there anything that you'd like to

7  add?

8       **INMATE RUIZ:**  That's about it.

9       **PRESIDING COMMISSIONER FISHER:**  Okay.  You

10 did a good job on this.

11      **INMATE RUIZ:**  Thank you.

12      **PRESIDING COMMISSIONER FISHER:**  We're going

13 to go ahead and recess.  We'll have you come

14 back in just a little bit.

15                    **R E C E S S**

16                     --o0o--

17

18

19

20

21

22

23

24

25

26

27

46

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3          DEPUTY COMMISSIONER HARMON:  You're on

4      record.

5          PRESIDING COMMISSIONER FISHER:  All right.

6      Thank you.  I want to note for the record that

7      everyone who was previously in the room and

8      identified themselves from returned in the room.

9      And Mr. Ruiz, the Panel reviewed all the

10     information received from the public and relied

11     on the following circumstances in concluding

12     that you're not yet suitable for parole and

13     would pose an unreasonable risk of danger to

14     society or a threat to public safety if released

15     from prison.  You know, this is -- the factors

16     for finding you not unsuitable for parole are

17     essentially the same as the factors for which we

18     found that it wouldn't be reasonable for you to

19     receive a parole date during the next two years,

20     and essentially it comes down to, in both cases,

21     the fact that you have been unable to program

22     for such a long time and don't have a lot of the

23     things in place that you would need in order for

24     us to be comfortable that you would do well once

25     you were released from prison.  And I know that

26     there's been a lot of talk about you debriefing.

27     GEORGE RUIZ B-82089 DECISION PAGE 1 5/9/06

47

1   I'm hoping that, and I certainly can understand

2   why you wouldn't want to, and I would never ask

3   you to do something like that.  I do hope though

4   that you'll be able to become inactive -- get an

5   inactive status.  I would like for you to be

6   able to do that so that you can get into a lower

7   custody and institution where you can start to

8   program.  Once of the things that I wanted to

9   recommend to you, though, since you don't have a

10  GED, and you talked about the GED express.  In

11  your reading, you did a great job on the brief

12  that you put together.

13      **INMATE RUIZ:**  Thank you.

14      **PRESIDING COMMISSIONER FISHER:**  So I'm

15  wondering if since you have the support of your

16  family, if your daughter might be able to help

17  get you some books that you could work on your

18  reading on your own --

19      **INMATE RUIZ:**  Yes.

20      **PRESIDING COMMISSIONER FISHER:**  -- and

21  start to program that way, and then do the GED

22  express following that.  You have the vocational

23  body and fender, but like you said, everything

24  is plastic now.

25      **INMATE RUIZ:**  Yes.

26      **PRESIDING COMMISSIONER FISHER:**  It's been a

27  **GEORGE RUIZ B-82089 DECISION PAGE 2 5/9/06**

48

```
 1   long time, so we need to see you be able to gain
 2   some work skills.  I know that you have a job
 3   offer on the outside.  It's pretty unskilled
 4   type of work though, and should something happen
 5   with that, you'd be back in a position of not
 6   having something that you could fall back on, so
 7   we just want to see you be able to do that work.
 8   You've been disciplinary free since 1986.  I
 9   mean, there's just not enough I can say about
10   how important that is, and your last 128 was
11   five years ago, so in that area you're certainly
12   doing a good job.  Another thing that
13   Commissioner Harmon mentioned to me was that you
14   might want to check into social security and see
15   if you have benefits coming.  But the main
16   concerns, obviously, are the fact that you -- is
17   your custody level and the fact that you've been
18   unable to do any programming because of your
19   custody level.  So I'm not sure how exactly that
20   can be addressed, but I do hope that you can at
21   least start to work toward an inactive status.
22   And I believe that completes the reading of the
23   decision.  I do want to note that we have -- we
24   had a letter from the District Attorney's office
25   in opposition of a finding of suitability at
26   this time.  Do you have anything you'd like to
27   GEORGE RUIZ B-82089 DECISION PAGE 3 5/9/06
```

49

1   add?

2       **DEPUTY COMMISSIONER HARMON:**   Yeah.   Mr.

3   Ruiz, regarding social security, you're 63 going

4   on 64?

5       **INMATE RUIZ:**   Yes.

6       **DEPUTY COMMISSIONER HARMON:**   If you could

7   write to them, which a lot of the guys do, and

8   request a document regarding your benefits, and

9   what they do is actually make that part of your

10  C file.  And the reason for that is -- is that

11  it show that you do have some money coming in,

12  and it does show that you qualify.   In other

13  words, because you're going to need a source of

14  income.

15      **INMATE RUIZ:**   Yeah.

16      **DEPUTY COMMISSIONER HARMON:**   You know,

17  that's reasonable, and I think it would be very

18  beneficial for you to do that.   I also want to

19  re-encourage you, as I said before, to contact

20  your counselor and look at some of those

21  programs, The Inside Out Series or maybe the --

22  there's a -- I believe it's called The Classroom

23  Learning Network.   See if any of those programs

24  are available to you that you can partake in the

25  prison.   Okay.

26      **INMATE RUIZ:**   Yes.

27  **GEORGE RUIZ B-82089 DECISION PAGE 4 5/9/06**

50

1    **DEPUTY COMMISSIONER HARMON:** And as well as

2  your self-help, the books that you're reviewing,

3  you know, the document that you gave us to

4  review earlier was well done.  It was well

5  thought out, and you put a lot of time into it,

6  in fact, you even included case law.

7    **INMATE RUIZ:**  Yeah.

8    **DEPUTY COMMISSIONER HARMON:**  Okay.  But why

9  not write-up maybe a book report or two

10  regarding books that you've read on your own and

11  what you've learned from it, maybe in terms of

12  how it's -- helped you develop insight into your

13  behavior.  Do you see what I mean that led up to

14  prison?

15    **INMATE RUIZ:**  Uh-huh.

16    **DEPUTY COMMISSIONER HARMON:**  It would be

17  really important.  Some guys do this, and they

18  are very successful with it.  These are just

19  ideas.  It's better than sitting in your cell

20  and rotting.

21    **INMATE RUIZ:**  Yeah.

22    **DEPUTY COMMISSIONER HARMON:**  You know --

23  you know what I mean?  And as far as your

24  grandchildren go, I mean, you and I talked about

25  it last time.  As I know, I'm a grandparent

26  also.

27  **GEORGE RUIZ B-82089 DECISION PAGE 5 5/9/06**

51

1      **INMATE RUIZ:**  Yes.

2      **DEPUTY COMMISSIONER HARMON:**  And, probably

3   more important to me than anything in the world

4   have that time with those children when I'm

5   still around.  So, you know, you may have to

6   revaluate where you're at in your life, and you

7   may have to make some other choices.  That's

8   going to be your decision, but I want to wish

9   you luck, and I hope you continue on the path

10   that you've been on in terms of this reading on

11   your own and staying out of trouble and that

12   type of thing.  So I wish you luck, sir.

13      **INMATE RUIZ:**  Thank you.

14      **PRESIDING COMMISSIONER FISHER:**  Thank you.

15      **ATTORNEY FALLMAN:**  Commissioner, would you

16   please send a copy if you would?

17      **DEPUTY COMMISSIONER MUGA:**  Will do.

18      **ATTORNEY FALLMAN:**  Thank you.

19      **PRESIDING COMMISSIONER FISHER:**  Thank you.

20      **DEPUTY COMMISSIONER HARMON:**  Good-bye.

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON Sep. 9, 2006**

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **GEORGE RUIZ B-82089 DECISION PAGE 6 5/9/06**

52

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 51, and which

recording was duly recorded at PELICAN BAY STATE

PRISON, CRESCENT CITY, CALIFORNIA, in the matter of

the SUBSEQUENT PAROLE CONSIDERATION HEARING OF GEORGE

RUIZ, CDC NO. B-82089, ON MAY 9, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated June 27, 2006, at Sacramento, California.


STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**